UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA
ex rel. ROLAND MORE,
        Plaintiff,

vs.

TENET HEALTHCARE CORPORATION,
        Defendant.
_____/

CASE NO.

COMPLAINT

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. Section 3730 (b)(2)

The United States of America, by and through *qui tam* Relator, Roland More, brings this action under 31 U.S.C. Sections 3729 (the False Claims Act), to recover from Defendant, Tenet Healthcare Corporation, all damages, penalties and other remedies available under the False Claims Act, on behalf of the United States and himself; and Plaintiff would show the Court the following:

## I.
## OVERVIEW OF THE COMPLAINT

1. This is a civil action brought by Relator Roland More ("Relator") on his own behalf and on behalf of the United States of America ("United States"), against Tenet Healthcare Corporation ("Defendant" or "TENET"), under the *qui tam* provisions of the Civil False

Claims Act, 31 U.S.C. Section 3729, *et seq.* (the "False Claims Act" or "FCA"), to recover damages, civil penalties and other relief owed to the United States and Relator.

2. In connection with the receipt or reimbursement from the United States Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HFCA"), Defendant has committed fraud against the Medicare Program, Title VIII of the Social Security Act, 42 U.S.C. Sections 1395-1395ccc and 42 C.F.R. Parts 400-1004, by (a) knowingly presenting, and causing to be presented to an officer and employee of the United States Government, false and fraudulent claims for payment and approval; and (b) knowingly making, using and causing to be made and used, false records and statements, in order to obtain payment and approval for false and fraudulent claims, by the United States Government, in violation of 31 U.S.C. Sections 3729 (a) (1) and (2).

3. In short, Defendant, a private, for profit group of hospital facilities, has defrauded the United States, through a systemic pattern and practice of using more highly compensated hospital employed nurse practitioners, with higher associated reimbursement schedules under Medicare, to place medical orders on behalf of physicians; rather than utilizing lower cost intensive unit care nurses, who previously performed the same function, within the facility; and such a practice, using hospital employed nurse practitioners, for placing medical orders on behalf of physicians, was neither reasonable or necessary; the practice was instituted merely to obtain a higher Medicare reimbursement rate, thereby perpetrating a fraud upon the Medicare Program,

Title VIII of the Social Security Act, 42 U.S.C. Sections 1395-1395ccc and 42 C.F.R. Parts 400-1004; moreover, Defendant has committed fraudulent billing for patient assessments, in the intensive care unit, whereby excessive billing was reported for patient assessments; thereby perpetrating a fraud upon the Medicare Program, Title VIII of the Social Security Act, 42 U.S.C. Sections 1395-1395ccc and 42 C.F.R. Parts 400-1004; and further, Defendant failed to meet intensive care unit operations criteria, for a specific room within its intensive care unit; specifically, Room 213; resulting in the providing of substandard care; and yet, this room was unlawfully included as part and parcel for the billing of the entire intensive care unit, and this substandard room was billed as part of the intensive care unit facility, resulting in the submission of fraudulent billing statements to the Medicare Program, Title VIII of the Social Security Act, 42 U.S.C. Sections 1395-1395ccc and 42 C.F.R. Parts 400-1004.

## II.
## PARTIES

4. Relator, Roland More ("MORE"), is a resident of Miramar, Broward County, within the State of Florida; and he was employed by Defendant, as an intensive care unit nurse at its hospital facility, entitled, North Shore Medical Center, which is located in Miami-Dade County, from on or about, August of 2011, until his termination from employment on September 8, 2014.

5. MORE holds a Masters in Public Health ("MPH"); Bachelors of Medicine/ Bachelors of Surgery ("MBBS"); he also holds a Ph.D., *Summa Cum Laude*, in epidemiology and

3

bioweapons defense; and finally, in June of 2014, he graduated *Magna Cum Laude* from medical school, obtaining an M.D., or Doctor of Medicine degree. MORE was also awarded the 2014 Albert Einstein prize in Biomedical Sciences for his extensive research in the area of bioweapons defense research; and this award was presented to him by Dr. George Einstein, PhD DSC (Hon) of the Einstein Medical Institute in June of 2014.

6. MORE is a current member of Miami-Dade County Health Department's Medical Reserve Corps. Epidemiology Response Team, DMAT – Disaster Medical Assistance Team; he is also a member of the FEMA Search and Rescue trained first responder unit and in addition, MORE is a March 2002 Graduate of Broward Fire Academy Class # 176.

7. As of December, 2012, MORE holds numerous certificates of completion of training from FEMA's Institute of Emergency Management, as part of the United States Department of Homeland Security.

8. As of January. 2013, MORE holds numerous certificates of completion from JOHNS HOPKINS BLOOMBERG SCHOOL of PUBLIC HEALTH, in Anti-Terrorism Biological and Radiological training pertaining to Weapons of Mass Destruction..

9. MORE is a recipient of the Emergency Medical Services Medal of Valor, as well as the distinguished service award as the most distinguished public servant of the City of Miami as of July 28, 2005, which was conferred upon him by the Mayor and the full Commission of the City of Miami and in addition, the Mayor and County Commission

4

of Miami–Dade County also formally recognized MORE for his heroism and public service on June 5, 2005.

10. MORE was inducted into the *Sigma Theta Tau* International Honor Society of Nursing for his nursing leadership on April 22, 2014; and he is also a member of LAMBDA CHI Chapter at Barry University.

11. MORE is an *ex-officio* board member of the Miami-Dade Board of Community Relations, he was officially appointed to the Community Relations Board by current Miami-Dade County Commission Vice-Chairman, the Hon. Commissioner Jose " Pepe " Diaz, from or about 2002-2004; and in that capacity, MORE served as liaison to Miami-Dade County's Board of Relations to the City of Miami's Board of Community Relations; in this role, MORE assisted with the security aspects of major public events, including the first Latin Grammy's event held in Miami; he worked with other community, state and national leaders in order to foster better relations among the different ethnic and racially diverse cultures of the community; MORE was further recognized by community leaders, for his abilities to recognize and correct difficult problems and he also became a formal and informal policy advisor to many state, local and federal officials.

12. Defendant, Tenet Healthcare Corporation ("Defendant" or "TENET"), is a Texas corporation, with its principal place of business located at 1445 Ross Avenue, Suite 1400, Dallas, Texas 75202.

13. Defendant is one of the largest healthcare providers in the United States, operating with eighty (80) hospitals in fourteen (14) states; including North Shore Medical Center and four other facilities in Miami Dade County; and nationwide, it employs over one hundred five (105,000) thousand employees.

14. Medicare comprises approximately thirty one (31%) of Defendant's payor sources nationally.

### III.
### JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. Sections 1331(Federal question) and 1345 (United States as plaintiff), as well as, 31 U.S.C. Section 3732 (a) (False Claims Act).

16. This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. Section 3732 (a) because the Defendant can be found, resides or transacts business in the Southern District of Florida and because an act proscribed by 31 U.S.C. Section 3729 occurred within this District, since Plaintiff was formerly employed at a facility owned and operated by Defendant, North Shore Hospital, which is located at 1100 N.W. 95th Street, Miami, Florida 33150. Title 31, United States Code, Section 3732 (a) further provides for nationwide service of process.

17. Upon information and belief, there are no pending actions that would be deemed to be related to this action, and further this Complaint is not based upon facts underlying any

such pending action, within the meaning of the False Claims Act first to file rule, 31 U.S.C. Section 3730 (b)(5).

18. This action is not precluded by any provisions of the False Claims Act's jurisdiction bar, 31 U.S.C. Section 3730 (e), *et seq.*

   a. Upon information and belief, this Complaint is not based upon the allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party, 31 U.S.C. Section 3730 (e)(3).

   b. Upon further information and belief, there has been no "public disclosure" of the matters alleged herein and this action is not "based upon" any such disclosure, within the meaning of 31 U.S.C. Section 3730 (e) (4)(A). Notwithstanding the foregoing, Relator is an "original sources," of this information, as defined by 31 U.S.C. Section 3730 (e)(4)(B) of the False Claims Act, and as such, he is expressly excepted from the public disclosure bar.

19. Venue is proper in the Southern District of Florida, under 28 U.S.C. Sections 1391 (b) and (c), and 31 U.S.C. Section 3732(a), because the Defendant can be found in and transacts business within this District.

## IV.
## FEDERAL FALSE CLAIMS ACT

20. The False Claims Act ("FCA") was originally enacted in 1863, and it was substantially amended in 1986 by the False Claims Amendments Act, Pub. L. 99-562, 100 Stat. 3153.

Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of government frauds to disclose the information without fear of reprisals or Government inaction; and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.

21. The Act provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false statements and fraudulent claims, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of damages sustained by the federal government.

22. The Act allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of sixty (60) days (without service on the defendant during that time). Based upon these provisions, qui tam plaintiff and Relator seek through this action to recover all available damages, civil penalties and other relief for federal violations alleged herein.

23. Although the precise amount of the loss from the Defendant's misconduct alleged in this action, cannot be precisely determined, it is estimated that the damages and civil

penalties may be assessed against the Defendant under the facts alleged in this Complaint amounts to millions of dollars.

24. Defendant's misconduct implicates not only the integrity of the Medicare billing process, but also, the quality of care delivered to patients at its North Shore Medical Center facility.

25. The text of the False Claims Act provides, in pertinent part, that:

> (a) Any person who . . . (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [and] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person . . . (b) For purposes of this section, the terms "knowing" and "knowingly," mean that a person, with respect to information . . . (1) has actual knowledge of the information;(2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information and no proof of specific intent to defraud is required.
> 31 U.S.C. Section 3729.

## V.
## **MEDICARE**

26. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program.

27. Medicare is a federally funded health insurance program, primarily benefiting the elderly; and entitlement to Medicare is based upon age, disability or affliction with end stage renal disease. See, 42 U.S.C. Section 426, *et seq.*

28. Part A of the Medicare Program, the Basic Plan of Hospital Insurance, authorizes payment for institutional care.

29. The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services. ("CMS").

30. To assist in the administration of Medicare Part A, CMS contracts with fiscal intermediaries, see, 42 U.S.C. Section 1395h.

31. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

## VI.
## FALSE CLAIMS ACT ALLEGATIONS

32. Beginning on or about December 1, 2013, Defendant instituted a new administrative policy, whereby hospital employed nurse practitioners would provide and or place applicable medical care orders on behalf of treating physicians.

33. Prior to December 1, 2013, all hospital employed nurses would efficiently and competently provide and or place applicable telephone medical care orders on behalf of physicians, when those physicians were not physically present in the building, at the approximate rate of one thousand, plus or minus telephone orders, per day.

34. All hospital nurses including intensive care unit nurses are fully capable and qualified to provide and or place the telephone medical care orders on behalf of physicians, who were not physically present; and in fact, the new administrative policy was implemented

10

for the sole purpose of obtaining increased Medicare reimbursement rates to the benefit of the Defendant,

35. However, subsequent to December 1, 2013, Defendant utilized hospital employed nurse practitioners, specifically hired only for the purpose to provide and or place telephone medical orders on behalf of physicians, the nurse practitioners did not engage in any direct patient care, they had no direct patient contact, there was no entry of any progress notes from the hospital employed nurse practitioners, no assessments performed on the patients in question from the hospital employed nurse practitioners.

36. In many instances, the telephone orders from the physicians were entered by the nurse practitioners. even though the physicians were physically onsite at the facility, with the knowledge of the Defendant; and in contrast, all hospital employed bedside nurses and intensive care unit nurses had previously placed all telephone medical orders on the physicians' behalf without any delay in patient care or delays in implementing treatment, thereby avoiding patient safety risks.

37. The Medicare reimbursement rate for nurse practitioners is eighty five per cent (85%) of the rate of the physician Medicare reimbursement rate, obviously higher, as compared to the corresponding reimbursement rate for all the hospital employed bedside nurses, including the intensive care unit nurses; and this is the sole reason the Defendant instituted the new medical order placement policy and or practice, at the end of 2013.

38. The utilization of hospital employed advanced registered nurse practitioners or ARNP's, hired in late 2013, specifically, and only to provide and place telephone medical orders

11

on behalf of physicians present, and not present in the facility, at the times the orders were received and entered, enabled Defendant to bill the time of employed nurse practitioners at a higher reimbursement rate, and this ;practice and or policy, was neither reasonable or necessary, thereby perpetrating a fraud upon the Medicare Program, in violation of Title VIII of the Social Security Act, 42 U.S.C. Sections 1395-1395ccc and 42 C.F.R. Parts 400-1004.

39. On January 13, 2014, Relator MORE informed Defendant's supervisory personnel, specifically, Kristen Peyper ("PEYPER"), the Intensive Care Unit Director; and the Nurse Manager, Keith Harmon ("HARMON"), of fraudulent billing practices in the intensive care unit, particularly, in the portion of that unit, Room 213, which lacked the required electronic monitoring capability, a camera, as well as linked telemetry coverage to the nursing station; and this deficient portion of the intensive care unit, Room 213, was being unlawfully and fraudulently billed to the Medicare Program, as an actual part of the intensive care unit.

40. Room 213, located outside the intensive care unit, was physically separated by double fire doors, this room presented serious patient safety issues, in that Defendant was clearly providing substandard care in that room; and yet, Defendant continued to bill the Medicare program for the use of this room for years, as if it actually qualified, functionally, and operationally, as an intensive care unit room.

41. In addition to the unlawful and fraudulent billing practices, which implicate the Medicare Program, due to the lack of monitoring capability, the lack of a camera and the

deficient telemetry capabilities in Room 213, the deficient equipment in this room, have put the health and safety of patients at risk in the intensive care unit.

42. Moreover, PEYPER admitted to Relator that she knew of the unlawful and fraudulent billing practices, implicating the Medicare Program, with regard to Room 213; and she further admitted to Relator that patients were indeed at risk in this room; however, she told Relator not to continue to voice his substantive legal and patient safety concerns pertaining to Room 213.

43. PEYPER further instructed MORE not to voice his concerns about the substandard patient care methods, associated with Room 213, within the intensive care unit, in staff patient safety meetings.

44. Despite management's objections to his complaints about fraudulent billing practices and patient safety issues, on January 30, 2014, MORE filed a complaint with the Agency for Healthcare Administration ("AHCA"), regarding the deficient and substandard patient care, which was being provided by Defendant, within Room 213 of the intensive care unit.

45. Furthermore, on January 30, 2014, Relator personally went to the Defendant's Human Resources Office, to notify management of his prior filing of the AHCA complaint; however, because the Human Resources Director was not present, MORE sent an e-mail communication to the Defendant's Human Resources Office, explaining the basis of his AHCA complaint.

46. Following the filing of his AHCA complaint, on or about January 31, 2014, Relator was suspended from his position for one week with pay, and he was told by Chief Nursing Officer Patrick Beaver ("BEAVER"), that he (MORE) appeared to be "stressed out," and although MORE was told by BEAVER that his job was not in jeopardy, he was also told that he had no other alternative but to remain out of work for one week.

47. However, despite Relator's internal complaints to Defendant's supervisory personnel and the submission of his AHCA complaint, Defendant's fraudulent billing practices continued, with regard to the unlawful designation of Room 213, as part of the intensive care unit, for Medicare billing purposes, and patients continued to be at risk in Room 213 for another two and one half weeks, and then, hospital CEO Manuel Linares ("LINARES"), a representative from Defendant's corporate headquarters, placed a padlock on Room 213.

48. On April 3, 2014, AHCA validated Relator's patient safety concerns, as contained in his AHCA complaint; and AHCA specifically found that with regard to Room 213 of the intensive care unit, the safety of patients was at risk, because applicable regulations and laws had been violated by the Defendant.

49. On May 12, 2014, PEYPER confronted MORE; and she told him that he had not been performing patient neurological assessments in the intensive care unit; however, MORE had previously complained to PEYSER, over a period of several months, that the computer system was not properly inputting the patient assessments; and due to this

error, assessments were being repeated; and the Medicare Program was possibly being unlawfully and fraudulently billed for the assessment duplication.

50. Duplicative billing most likely occurred because the Defendant purchased the most inexpensive and inefficient version of the computer medical data entry system that was available.

51. On or about June 22, 2014, Relator complained to Defendant's supervisory personnel, regarding patient assignment procedures in the intensive care unit, which had been put into operation by Defendant's supervisory administrative staff; and according to MORE, the new policy had put patients at risk in the intensive care unit.

52. On July 5, 2014, MORE complained to the day and night shift charge nurses that he was the only nurse to be assigned three patients; the patient work load was clearly excessive, for example, one patient weighed 334lbs, and the second patient weighed over 280 lbs and a third patient weighed over 200 lbs.; and yet, the other nurse's shifts were cancelled Relator More was the only nurse supervising these three patients.

53. Furthermore, on July 5, 2014, Relator MORE raised additional patient safety concerns to supervisory staff and his concerns were not addressed; among these concerns, included assigning unstable post-surgical patients, with substandard, not inoperable and outdated hospital equipment in the intensive care department; not providing essential pulse oximetry equipment because this equipment was not available for this post-surgical patient; and MORE raised concerns about the afforded to a psychiatric patient with

suicidal ideations, who had locked himself in the bathroom while another nurse was monitoring the patient

54. On July 7, 2014, AHCA staff performed an on-site regulatory visit at the North Shore Hospital, regarding issues unrelated to MORE'S prior AHCA complaint of January 30, 2014.

55. On July 8, 2014, MORE was called into an investigatory/disciplinary meeting with BEAVER and PEYPER, specifically regarding accusatory and negative concerns, which both BEAVER and PEYPER had expressed about Relator MORE'S prior AHCA complaint.

56. During the July 8, 2014 investigatory/disciplinary meeting, MORE was denied union representation, the meeting continued for forty five minutes and MORE was questioned for twenty minutes on his prior AHCA complaint.

57. Immediately following the July 8, 2014 investigatory/disciplinary meeting, MORE was placed on administrative suspension with pay.

58. On July 30, 2014, Relator was placed on an investigatory suspension without pay for one week; and thereafter, he was placed in a pay status, until his termination

59. On September 8, 2014, Relator was terminated from his employment for entirely pretextual reasons, namely, he purportedly had made misleading statements regarding his position at the hospital to his peers, and he allegedly had made similar misleading statements to the Hospital's Chief Executive Officer, LINARES; and finally Defendant erroeneosly asserted that Relator had been "disruptive" in the workplace.

## COUNT I
### (VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. Sections 3729 (a) (1) and (a) (2))

60. Relator realleges and incorporates by reference the allegations contained in Paragraphs 1-59 of the Complaint.

61. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. Sections 2729, *et seq.*, as amended.

62. By virtue of the acts described above, Defendant knowingly presented or caused to be presented to the United States Government false or fraudulent claims for the payment or approval of medical services.

63. By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records or statements to cause a false or fraudulent claim to be paid or approved by the United States Government.

64. The United States, unaware of the falsity of the records, statements or claims made by the Defendant, paid the Defendant for claims that would otherwise not be allowed.

65. By reason of these payments, the United States has been damaged and continues to be damaged, in a substantial amount.

**WHEREFORE**, Relator, Roland More, requests that judgment be entered against the Defendant, ordering the following relief:

   a. Defendant pays not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. Section 3729, plus three times the amount of damages the United States has sustained because of the Defendant's actions;

b. Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. Section 3730(d);

c. Relator be awarded all costs of this action, including attorney's fees and costs pursuant to 31 U.S.C. Section 3730 (d); and

d. The United States and Relator recover such other relief as the Court deems just and proper.

## COUNT II
### (VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. 3730 (h) (FCA WRONGFUL DISCHARGE))

66. Relator realleges and incorporates by reference the allegations contained in Paragraphs 1—59 of the Complaint.

67. Defendant has a duty under the False Claims Act, 31 U.S.C. Section 3730 (h), to refrain from taking retaliatory actions against employers who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for or assistance in an FCA action.

68. Relator took lawful actions in furtherance of a False Claims Act action, included but not limited to, investigation for, or assistance in, an action filed under this section; and as such, he engaged in protective activity under the False Claims Act and other laws.

69. On or about September 8, 2014, Defendant terminated Relator's employment.

70. Relator was discriminated against by Defendant in the terms and conditions of his employment, because Defendant, through its officers, agents and employees, because of lawful acts performed by Relator in furtherance of an action under the False Claims Act.

71. The actions of the Defendant damaged and will continue to damage Relator in violation of 31 U.S.C. Section 3730 (h), in an amount to be determined at trial.

72. Pursuant to 31 U.S.C. Section 3730 (h), Relator is entitled to litigation costs and reasonable attorney's fees incurred in the vindication of his reputation and the pursuit of his retaliation claims.

**WHEREFORE**, Relator, Roland More, requests that judgment be entered against the Defendant, ordering the following relief:

a. For all proper damages in favor of Relator as a result of the Defendant's violation of 31 U.S.C. Section 3730 (h), including reinstatement with the same seniority status that Relator would have held, but for the discrimination, two times the amount of back pay and compensation for all special damages sustained as a result of the discrimination, including attorney's fees, costs and expenses; and

b. Such other and further relief as this Court deems just and proper.

### Demand for Jury Trial

Plaintiff demands Trial by Jury of All Issues So Triable.

19

Respectfully submitted,

Mark J. Berkowitz, P.A.
Attorney for Plaintiff
800 S.E. Third Avenue
Suite 400
Ft. Lauderdale, Florida 33316
(954) 527-0570 Telephone
(954) 767-0483 Telecopier
E-Mail: mjb2157@aol.com.
Fla. Bar No. 369391

/s/ Mark J. Berkowitz
By: Mark J. Berkowitz

Dated on this 12th day of September, 2014.